H. H. FROST ET AL. *v.* V. M. FROST ET AL.

1. MANDAMUS OF DISTRICT JUDGE.—It was alleged that appellant had been deprived of the benefit of a statement of facts, by the unnecessary, intentional, and wrongful adjournment of the court before there had been time within which the statement of facts could have been prepared, and that the district judge, for the purpose of depriving the appellant of the benefit of the appeal, had refused after the adjournment of the term, and also at its next term, to sign and certify a statement of facts, or to sign a bill of exceptions to his action in refusing to do so: *Held,* Such facts would not authorize the issuance of the writ of *mandamus* against the district

judge, requiring him to sign and certify a statement of the facts proven on the trial of the cause.

2. SAME—STATEMENT OF FACTS—STATUTORY RULE.—Paschal's Dig., 1871, prescribes the statutory rule by which a statement of facts shall be certified to this court on appeal or error; the appellate court will not regard a statement of facts made or certified in any other manner.

3. PRACTICE IN SUPREME COURT.—It is the general practice of this court, in the absence of a statement of facts, not to revise the rulings made during the progress of the trial or the giving or refusing instructions to the jury. The errors of law, under such circumstances, usually noticed by the court, are those which arise upon the sufficiency of the petition or answer.

4. MISJOINDER OF CAUSES OF ACTION.—A petition joining in one suit an action by heirs &c., (1) for damages against one to whom administration had been illegally granted; (2) against others, residents of other counties, purchasers under such administration, to try title to lands situated in other counties; (3) against other heirs for partition; and (4) against the party administering the estate for the property in his hands: *Held,* A misjoinder of parties and of actions.

5. ADMINISTRATOR DE BONIS NON.—Where an estate has not been fully administered, it is within the jurisdiction of the Probate Court to determine whether an administrator *de bonis non* should be appointed; whether its discretion in ordering an appointment was wisely exercised or not, cannot affect the validity of the order.

6. SAME.—That suits are pending by and against an administrator, and that the property of the estate has not been fully divided among those entitled to receive it, constitute sufficient grounds, upon the removal or resignation of an administrator, for appointing an administrator *de bonis non* upon such estate.

7. SPECIAL ISSUES—PRACTICE.—When special issues are presented to a jury, they should present the questions of fact in litigation. (See special issues insufficient to elicit a verdict decisive of the questions involved in the suit.)

APPEAL from Fort Bend. Tried below before the Hon. Livingston Lindsay.*

In June, 1871, V. M. Frost, for herself and John Wharton Frost and Mary Frost, her minor children, by her, as next

---

*The special issues submitted by the court below, would not be intelligible without a more lengthy report of the pleadings than is usual. It is also necessary to a proper understanding of the opinion.

friend, instituted suit against Ada, Henry H., Franklin Pierce, Harriet Ella, and Miles Frost, children of S. M. Frost, her deceased husband—Franklin Pierce Frost and Harriet Ella Frost being minors—and against J. R. Pettus, J. C. Williams, Sophia and Nathan Mayblum, W. L. Davidson, and others.

The petition set up in substance as follows: That she was the wife of S. M. Frost, deceased; that the minors, John W. and Mary Frost, were the children of herself and said S. M. Frost; that the defendants, Miles, Franklin Pierce, Harriet Ella, Henry H. and Ada, were the children of said S. M. Frost by a former wife, Harriet Frost, deceased. S. M. Frost died February 6, 1866, leaving a will, which was probated; that by the will Virginia was entitled to three fourths of the separate and community estate of S. M. Frost, defeasible upon her marriage or death, the property in that event passing to her children. John W. and Mary were made joint owners with her of block 502 in Galveston; to Miles, Franklin Pierce, and Ella he bequeathed one fourth of the separate and community estate, and block 113 in Galveston. That S. M. Frost died having real and personal estate worth over $50,000; that he was not indebted beyond $1,000. That William E. Kendall, in March, 1866, was appointed executor of the will, and qualified and acted as such till June, 1867, when he was removed. That at June Term, 1867, Kendall accounted with the County Court; that Kendall had paid all the debts and expenses of administration. That on the "27th June, 1867, all and singular the property of the estate, both real and personal, vested in the devisees of the said S. M. Frost, under his will aforesaid absolutely, subject to no right, authority, power, or jurisdiction whatever." That nevertheless, and though there was no necessity for further administration, the County Court (without jurisdiction) appointed John R. Pettus administrator *pro tem.* at the same June Term, and administrator in chief at the July Term, 1867; that Pettus took possession of the estate, and proceeded to exercise authority over the same as adminis-

trator; that without any real authority, he sold real and personal property of the estate, which was a sacrifice of plaintiffs' property; that he received large sums of money, and pretended to disburse them; that he sold the lands on Galveston Island, though specially devised; that he resigned his administration, but failed to return any of the property to the plaintiffs or the devisees; that by his acts the same has become a total loss, except a small amount of property received by Virginia; that he charged a large amount of illegal commissions, and that he is indebted to plaintiffs $3,000, for money and property received; that during his administration she was deprived of the use and enjoyment of the estate, and her rights and those of her children disregarded; that though her husband left her a good home, she was compelled by the County Court to accept another place to live on, and the court appropriated $5,000 for her, for which she took lands at a certain price in part payment, and the special legacy to herself and her children was sold and charged to her in part payment.   She alleged that "she was a female, and was unadvised and unable to cope with the said John R. Pettus and the wrongful action of the court."   That the plaintiffs were not bound by their acts, nor debarred of their rights to recover the property so squandered.   That at the April Term, 1868, the County Court discharged Pettus from the administration, and afterwards appointed J. C. Williams administrator *de bonis non* with the will annexed, who, as far as he could, took possession of the property and exercised control over it.   That he obtained from the court orders concerning the estate, and pretended to make partition and to sell property to divers persons.   That he sold the lands of the estate outside of Fort Bend county, and has made pretended titles to the purchasers.   That he sold, under orders of the County Court, lands in Fort Bend county which, by the will, were devised to plaintiffs and others.   That Henry H. Frost became the purchaser of the land in Fort Bend county; that Mayblum and Davidson purchased other lands, and that they

all pretend to hold under titles from Williams, which were a cloud upon plaintiffs' title.

That the minors, " Miles, Franklin Pierce, and Ella, should be plaintiffs in this suit, and that plaintiffs should recover with them, as devisees of S. M. Frost, deceased."

The plaintiffs alleged that they were the owners of three fourths of all the separate and community property; that Miles, Franklin, and Ella were the owners of the other fourth; that the estate referred to in the will was property acquired by Samuel Frost during his marriage with Harriet Frost, a former wife; that of said Harriet and Samuel there was another child, Belton O'Neal, who died after Harriet, and from whom Samuel inherited one half the interest Belton had in Harriet's estate; and, therefore, that plaintiffs were entitled to three fourths of seven twelfths of the community estate, and Miles, Franklin P., and Harriet to the other fourth of said seven twelfths.

They alleged that all the acts and proceedings in the County Court after the resignation of Kendall and of all persons in the estate, were wholly nugatory and void; and that petitioners would be impoverished if any effect were given to them, &c.

A supplemental petition was filed the 5th of July, 1871, making Walter Andrews, C. H. Kendall, A. Ludwig, J. Van Arsdale, W. G. Pettus, John D. Newell, J. H. Gile, Mrs. Pettus, executrix of John R. Pettus, of Fort Bend county, and William Kerr, of Milam county, H. W. Porter, of Burleson county, parties, alleging the death of Pettus, and that Mrs. Pettus was his executrix; that the other parties were purchasers of various tracts of land under Williams's sale, in different countries, and praying that they deliver up their deeds, &c.

The several defendants, except the minors and the defendant Newell, (against whom a default was taken,) demurred and answered.

The demurrer set up as special causes, first, the misjoin-

der of parties; second, the misjoinder of actions; third, that
the petition was multifarious, asking inconsistent judgments
against various parties; fourth, that it was sought to set aside
the judgment of the court and divest rights in a manner
unknown to the laws.

The defendants answered the general denial, and the pur-
chasers set up their purchases as made in good faith, &c.

The answer of the Mayblums and others, (which was
adopted by the Frost defendants,) alleged that when Kendall
was dismissed from the executorship there was due by the
estate, allowed claims of more than two thousand dollars to
creditors; that there was owing to plaintiff Virginia five
thousand dollars allowed for a homestead, and nine hundred
dollars for exempt property, twelve hundred dollars for a
year's support—in all, nearly ten thousand dollars.

That there were pending in the District Court several suits
against the estate; that Pettus was made administrator at
the urgent solicitation of the plaintiff Virginia; that she
signed his bond as temporary administrator and as adminis-
trator in chief; that in December, 1867, she united in a
sworn statement with Pettus in asking for the sale of the Gal-
veston island lot 502; that the mother of Virginia, Mrs. Videl,
had a claim against the estate for about $1,100, which Vir-
ginia inherited; that she presented to the administrator, Pet-
tus, her own claim for $1,587.80, which was allowed and
approved; that in Williams's administration she claimed an
allowance of $400 and $840, which was granted; and all
these claims, in all about $4,000, she, for value, assigned to
said Mayblum, warranting them, and obtaining money upon
them; that when Pettus resigned, in May, 1868, plaintiff
Virginia had many claims against said estate pending; and
that plaintiff prevailed upon Williams to take the adminis-
tration of the estate, and agreed to and did sign his bond as
administrator; that the lands of the estate were sold, at her
instigation and with her approval, by order of the County

Court, fairly, and that the said Mayblum purchased in good faith.

They avered that nearly all the acts of all the representatives of the estate were done upon the petition of said Virginia; that she had received the benefits thereof; that by her acts and representations defendants were involved in all the connection they have had with the estate, and that they were so situated that they would be hopelessly damaged if she were permitted to maintain this suit.

At the November term, 1871, it was "ordered that the minors, Harriet Ella Frost, Miles Frost, and Franklin P. Frost be made pla ntiffs in this suit, and that Isaac McFarland appear for th n as next friend."

On the fifth of November, 1871, the plaintiffs filed an amended petition, wherein they alleged that when Kendall resigned there wei no debts against the estate; that all had been paid; that the urt had no jurisdiction to create claims or to make allowar es; that by Frost's will it was provided that the estate of his deceased wife should be separated from his estate, but that the court disregarded the same, and made orders that the estate of Harriet should contribute to the claims against the estate of Frost. They alleged that Virginia and her children had a bequest of $1,000; that the estate was solvent, and that a year having elapsed, it was not competent for the court to retain jurisdiction to pay them what came to them by will, and to increase the expense of the same, &c.

They alleged, as to the claims, the want of jurisdiction, and particularly that the claim of $15,000, in favor of the heirs of Harriet Head, was not a valid claim, for want of jurisdiction, and that the heirs and devisees were not made parties thereto; that the Sims claim accrued after the death of S. M. Frost.

At the March Term, 1872, the plaintiffs filed a motion to review and set aside the orders of the County Court and of

the District Court in the estate, particularly enumerating fifteen orders and decrees.

To this motion the defendants excepted, and moved to dismiss it on the following grounds:

1. That there had been no service of it upon any party.

2. That it was repugnant to the allegations of the original petition.

3. That it did not state in what particular the orders were erroneous.

The court overruled this motion and the defendants excepted.

At the March Term, 1870, the defendant Frost amended his answer, and averred that the estate of S. M. Frost was never fully administered, but was still open; that all the debts had not been paid; that the community estate of S. M. Frost and Harriet Frost had been partitioned by decree of the court; that he was in possession of the land purchased by him in good faith; that he bought it for a valuable consideration, at public sale, under a decree of the court, and that the sale had been approved.

He further amended, alleging that the nine hundred and forty-five acres of land in Fort Bend county he bought at the special solicitation of plaintiff, as the result of a compromise arrangement, whereby she was greatly benefited, and that he satisfied a judgment against the estate of S. M. Frost for more than $15,000, and took land not then worth half that amount in satisfaction of it, to save the estate of S. M. Frost from total wreck. That at the time of the purchase there were many unsettled matters between himself and the estate of H. H. Frost, which he represented as administrator, and the plaintiff and the estate of S. M. Frost, which would involve expensive and protracted litigation and disturb the peace of the family, and that the compromise and agreement resulting in his purchase of said land was made at the solicitation of plaintiff, who was advised by able counsel, &c., and that it was done as a settlement of

family disputes, to prevent litigation and the ruin of Frost's estate.

He further alleged that the will of S. M. Frost was illegally probated, and denied its validity; that of Belton O'Neil's estate, S. M. Frost had received his full share, and disclaimed any interest therein.

To the motion for revision of the orders in probate, the defendants protesting that they ought not be compelled to answer it, filed an answer. They prayed that if the court proceeded to revise the orders, it might revise also the order admitting the will of S. M. Frost to probate as a void probate, and because the will was obtained to be executed as the result of the undue influence of the plaintiff and her mother upon an old man of seventy, &c.

At the July Term, 1872, plaintiffs filed an amended petition, wherein they alleged that prior to Kendall's discharge all the personal property held in community between Frost and his wife Harriet was distributed by Kendall, although no report of it was ever made; that the lands in Fort Bend county held in community between them were also partitioned, and report made but not acted upon by the court, but that the parties went into possession. Wherefore they alleged that all the debts were paid and partition made, and that all orders of the court were void.

The defendants (Mayblums) also amended their answer, setting up title to lot No. 513, on Galveston Island, purchased by L. M. Franklin, at public sale by Pettus, approved by the court, and paid for, and the money turned over to Miles, Frank, and Ella, the minors made plaintiffs, and expended for their maintenance and education; "and they say they ought not to be disturbed in their title, but they pray, in the contingency of the setting aside of the sale, they may recover the money paid ($1,375) and interest."

In 1872, Henry H. Frost, administrator of the estate of Harriet Frost, made himself party to the suit, and alleged that Samuel M. Frost, deceased, after the death

of his wife Harriet, sold to Kyle and Terry lands, the property of Harriet's heirs, and warranted the title; that the heirs of Harriet sued Kyle and Terry for the recovery of the lands, and recovered the same; that Kyle and Terry, making the administrator of the estate of S. M. Frost a party in that suit, recovered a judgment upon Frost's warranty for ——; that then, upon the compromise and agreement of all the parties interested in the estate of Frost, it was agreed that the heirs of Harriet should accept the judgment upon the warranty in discharge of the land, and that the estate of Frost should pay that judgment, and that the land of Frost's estate should be sold to satisfy the same.

It was charged that in pursuance of this agreement, the tract of nine hundred and forty-five acres of the Morton league was sold, and bought in by said Henry, as administrator, to pay the debt; all this with the full knowledge, consent, and procurement of plaintiff, (Virginia,) and the warranty was then satisfied.    He prayed that the interests of the estate might be protected if there are any irregularities, and the amount of the said judgment paid.

The judge, of his own motion, submitted special issues to the jury, as follows:

1. Was Dr. Pettus a creditor of the estate of Frost at the time of his application for and appointment to the administration?   Answer affirmatively or negatively, as you may believe the fact to be from the testimony.

2. At the time of the refusal of the executor, Wm. E. Kendall, to execute a new bond, and his displacement from the executorship by the Probate Court, were there any debts created in the lifetime of S. M. Frost, authenticated and allowed or approved and established by suit, left unpaid by the executor?   If so, what debt or debts, and what was the amount?   In responding to this issue, you are not to take into account the allowances made at various times to the different parties by the Probate Court after the death of S. M.

Frost; you are to consider only the debts created in the lifetime of S. M. Frost.

3. Was the estate of S. M. Frost solvent at the time of his death? In other words, was his estate, at the time of his death, sufficient and ample for the payment of all debts subsisting at that time against him? In responding to this issue, you are not to take into the estimate the contingent claim based upon the covenant of warranty of S. M. Frost in the deed of conveyance to Kyle & Terry.

4. Did the executor, Wm. E. Kendall, before his removal, assent to and deliver over to Mrs. V. M. Frost the property devised to her and her children, or any part of the property devised by the will of S. M. Frost? If you find that the property was delivered or allotted to her by the executor, state what part of the property devised to them by the will was delivered to them by the executor.

5. Was any portion of the personal property belonging to the estate distributed among the legatees while Wm. E. Kendall was the acting executor, and with the approbation and consent of said executor? If it was so distributed, find from the evidence before you what was the total value in money of all the personal property, and about what proportion of it was so distributed. Find these facts as nearly as you can from the evidence before you.

6. If there was any land delivered up to the plaintiff, V. M. Frost, and her children, devised to them by the will, by the executor, William E. Kendall, while he was acting as such executor, find, also, whether it was the land which was partitioned finally by the commissioners, under the order of the Probate Court, made during the executorship of William E. Kendall.

7. Say, in your finding, whether V. M. Frost went into possession of the land partitioned under the order of the court before William E. Kendall was discharged from the executorship, and with his consent and approbation.

8. The jury will also find whether the plaintiff, V. M. Frost,

after the compromise was reduced to writing, understood and knew fully its precise import, and, with such knowledge and understanding, gave her assent to it for herself and her minor children, and consented that the Probate Court should make an order confirming such compromise. Respond to the foregoing issues as they are numbered.

To these issues the jury responded:

1. We find that Dr. Pettus was no creditor of the estate of S. M. Frost at the close of the administration of W. E. Kendall, of the S. M. Frost estate.

2. We find that the estate of S. M. Frost owed a small amount to Baldwin & Williams at the close of W. E. Kendall's administration of Frost's estate.

3. We find that the estate of S. M. Frost was solvent at the time of the resignation of W. E. Kendall of the administration of S. M. Frost's estate.

4. We find that W. E. Kindall turned over to V. M. Frost property, personal and real, devised to her by the will of S. M. Frost, before his removal as such administrator. The land turned over was sixteen hundred and eight acres, in Fort Bend county.

5. We find that there was personal property turned over to the legatees, consisting in corn, amounting to about seventeen hundred bushels, valued at fifty cents, $850. Other personal property, amount divided, we have no recollection, from the evidence, and cannot estimate its value. This was done before the removal of Kendall.

6. We find that there was land turned over to V. M. Frost by W. E. Kendall before his removal. It was the same land partitioned by the commissioners under the order of the court, made during the executorship of W. E. Kendall.

7. We find that V. M. Frost did go into possession of the land partitioned, under the order of the court, before W. E. Kendall was discharged from the executorship with his consent.

8. We find that V. M. Frost, after the compromise was

reduced to writing, understood the same, and assented to the same for herself and children; and that the Probate Court should make an order confirming such compromise.

The following issues were asked by defendants to be submitted to the jury, but refused by the judge:

1. Was the estate of Frost fully administered by Kendall?

2. Were there any suits pending against said estate when Kendall was removed?

3. Were the debts against said estate all paid during Kendall's administration?

4. Were there any debts against said estate when J. A. Pettus was granted letters testamentary?

5. Were there any debts against said estate when Kendall was removed?

Upon the verdict of the jury the court decreed that the County Court of Fort Bend had no jurisdiction of the said estate after June 27, 1867, the date of the removal of Kendall, and that all its orders thereafter were void, "inasmuch as the debts of said estate existing at the date of the death of S. M. Frost had been paid, except a small amount, and inasmuch as the personal property of said estate had been partitioned," and the real estate in Fort Bend county divided and delivered to the persons entitled thereto under said will, by virtue of a decree of the said court made at the October Term, 1866, and inasmuch as there appears to have been funds in the hands of the executor to pay the small debt to Baldwin & Williams."

It was further ordered that the decree of the District Court of Fort Bend county, made in said estate on the 15th day of July, 1871, concerning certain lands situated in Ford Bend county belonging to the devisees of the will of S. M. Frost, deceased, be set aside and held for naught. Commissioners were appointed to make partition of the lands.

The defendants below appealed. There was no statement of facts.

On affidavit of counsel for appellants a writ of *mandamus*

was issued to the district judge, requiring him to sign and certify a statement of facts and bill of exceptions in the case. To this writ the judge made answer. The substance of the complaint against the district judge appears in the opinion.

*C. B. Sabin* and *W. P. Hamblin*, for the respondent, on the motion for *mandamus*, cited Sikes *v.* Ransom, 6 Johns., 279; Midberry *v.* Collins, 9 Johns., 345; State *v.* Todd *et al.*, 4 Ohio, 351; *Ex parte* Bradstreet, 4 Pet., 104; Griffith *v.* Cochran, 5 Bin., 103; Rex *v.* Justices of Wilts, 2 Chit., 257; Squire *v.* Gale, 1 Halst., (N. J.,) 156; Gray *v.* Bridge, 11 Pick., 189; Little *v.* Morris, 10 Tex., 263; Arberry *v.* Beavers, 6 Tex., 457; Glasscock *v.* Smith, Commissioner, &c., 3 Tex., 51.

*W. L. Davidson*, for appellants.    *George Quinan* and *Gustave Cook*, also for appellants.

*W. P. Hamblin*, for appellees.

MOORE, ASSOCIATE JUSTICE.—We find a preliminary question in this case, which must be disposed of before considering those which go to the merits of the appeal.

On the 13th of January, 1873, the term of the court to which the appeal was returnable, on application of appellants, supported by affidavits, an alternative writ of *mandamus* issued to the presiding judge before whom the case was tried in the court below, requiring him on or before the 1st day of April thereafter, to sign and certify a statement of the facts proved on the trial of said cause, and also to sign and certify the bill of exceptions taken by appellants to his ruling in reference to said statement of facts, at the next term of the court subsequent to that at which the case was tried, or show cause for his failure to do so.

In due time an answer under oath was made to this writ, and cause shown why it should not be made absolute. The

answer and affidavits accompanying it seemed quite sufficient for a discharge of the writ, if, indeed, there had been any good ground for its issuance in the first instance. But so far as the record shows, the writ was neither discharged nor made absolute, and no further action seems to have been taken in the matter.

The application, in our opinion, however, presents no sufficient cause for issuing the writ, and it should have been refused; for, taking the statements made by appellants' counsel as entirely accurate in every particular, (though it cannot be controverted that there are manifest discrepancies in their recollection of the matters deposed to, and that of the respondent and the parties whose affidavits are filed with his answer,) and viewing them in the strongest possible light, they can amount to no more than that appellant has been deprived of the benefit of a statement of facts on this appeal, by the unnecessary and intentional wrongful adjournment of the court before there had been time within which the statement of facts could possibly have been prepared; and that the judge, for the purpose of depriving them of the benefit of their appeal, had refused, after the adjournment of the court, and also at its next term, to sign and certify a statement of facts, or to give them a bill of exceptions to his action in refusing to do so.

By the statute regulating proceedings in this court, it is enacted that the trial of all cases on appeal "shall be on a statement of facts as agreed upon by the parties or their attorneys, certified to by the judge of the court below; or should the parties fail to agree, then the judge of the court below shall certify the facts; or on a bill of exceptions to the opinion of the judge; or on a special verdict; or on an error in law, either assigned or apparent on the face of the record; and in the absence of all these, the appeal shall be dismissed. (Paschal's Dig., art. 1871.)

The statement of facts and bills of exceptions are required in plain and unambiguous language, as has been frequently

decided by the court, to be prepared and submitted to the judge and signed by him, and filed as a part of the record during the term of the court at which such bill was taken or when said cause was tried. (Paschal's Dig., arts. 149 and 217–8–9.)

To enable this court to try the case on the statement of facts, bill of exceptions, &c., it is made the duty of the clerk of the District Court, immediately on an appeal being taken, to make out a full and perfect record of all the proceedings in such case. (Paschal's Dig., art. 1494.) And it is the proceedings had in the cause, as shown by this transcript of the record, to which, evidently, we must look on trying the case on the appeal, and not to proceedings had at a subsequent time, or to extraneous evidence showing that by the erroneous or even corrupt action of the judge presiding on the trial, the proceedings upon which appellant would try the case in this court were not consummated in the court below, or the evidence of them was not authenticated in the manner directed by the statute, so as to become a part of the record. It may be urged that, if this is the case, a corrupt judge may effectually deprive a party of all chance to correct his erroneous rulings by appeal to this court. We think, however, that this is a mistake, and that a strict and vigilant observance of the statutes regulating the practice of the District Court will be found amply sufficient to secure the rights of litigants, as well against corruption and a willful abuse of power as unintentional error. If, however, they are not, the remedy must be supplied by the legislative department of the government, and not by an unauthorized extension by this court of its powers and jurisdiction.

If the judge before whom the case was tried had, in obedience to the writ of *mandamus*, certified a statement of facts which had not been presented to the counsel for appellees during the term at which the case was tried, examined, and signed by the judge, or made out and signed by him, if counsel of the parties could not agree, and filed as a part of

the record of the term at which the case was tried, it could
not be considered by us in determining the case on this ap-
peal.   It follows that the alternative writ of *mandamus* was
improperly allowed, and must therefore be discharged at the
cost of the appellants; and it is so ordered.

Though the case comes before us without a statement of
facts or bill of exceptions, still, if there is error assigned or
apparent on the face of the record, or the special verdict
found by the jury does not warrant the judgment, it must
be reversed.   And we are clearly of the opinion that it will
have to be reversed on both of these grounds.

1.  It is the general practice of this court, in the absence of
a statement of facts, not to review the rulings made during
the progress of the trial, or the giving or refusing instruc-
tions to the jury.   The errors of law to which, under such
circumstances, we ordinarily look, are those which arise on
the sufficiency of the petition or answer; and we will, in
disposing of this branch of the case, confine ourselves to the
assignment that the court erred in overruling the exceptions
to the petition and amended petitions.

It would be impossible, without extending our opinion
beyond all reasonable limits, to give a condensed statement
or intelligent summary of appellee's original and amended
petitions, extending through many pages of this voluminous
record.   We will remark, however, that in the original peti-
tion all the proceedings had in the County and District Courts
in administration of the estate of S. M. Frost, deceased, subse-
quent to the removal of W. E. Kendall as executor, are alleged
to be absolutely null and void, because, as it is claimed, said
estate had been fully administered by said Kendall, and that
therefore the court had no jurisdiction to grant administra-
tion *de bonis non* upon it.   While in the amended petition it
is sought merely to review and correct *en masse* the various
and heterogeneous orders made by the court in the course of
its administration, from the removal of Kendall up to the
bringing of the suit.

If we consider the case as made in the original petition—and it is upon this aspect of it the judgment of the District Court was rendered—it will be found that it is a suit by the appellees as heirs and distributees of said estate of S. M. Frost, deceased, against one of the parties, to whom it is alleged administration on said estate had been illegally granted, for damages; against other parties, who are now residents of Fort Bend county, to try title to a number of different tracts of land situated in various localities in the State; against others for the partition of the community estate of S. M. Frost, deceased, and his first wife, Harriet Frost, deceased, and to recover from another defendant, by whom said estate was being administered, the property of the estate in his hands.

It is evident, we think, from this mere statement of the objects and purposes sought to be attained by the suit, that there is a misjoinder of parties and causes of action.

Nor, if we consider the case as presented in the amended petition, is it free from similar objections; nor does it in any respect pursue or conform to the statutory directions for revising proceedings of the County or District Court in matters of probate. (Paschal's Dig., arts. 480, 1382, 1384, 5771:) And, taking the original and amended petitions together, they are not only objectionable because of multifariousness, but also because inconsistent and contradictory judgments are asked for against various parties having no joint or common interest in the matters to be litigated.

For these, as well as other grounds apparent upon the record, appellant's general and special demurrer should have been sustained.

2. Will the special verdict of the jury support the judgment?

On the trial of the case, the court, at its own instance, submitted to the jury eight special issues, and refused to submit all those which were proposed by appellants. Upon the verdict returned by the jury in response to the issues thus submitted, and without a general finding, the court decreed that

the County Court of Fort Bend county had no jurisdiction
of said estate subsequent to June 27, 1867, the date of the
removal of W. E. Kendall, the executor named in the will
of S. M. Frost, and that all its orders thereafter were null
and void. "Inasmuch," says the court, "as the debts of said
estate existing at the date of the death of S. M. Frost had
been paid, except a small amount, and inasmuch as the per-
sonal property of said estate had been partitioned, and the
real estate in Fort Bend county divided and delivered to the
persons entitled thereto under said will, by virtue of a decree
of said court, made at the October Term, 1866, and inas-
much as there appears to have been funds in the hands of
the executor to pay the small debt to Baldwin & Williams."

It might suffice to say, if the grounds upon which the court
rests its judgment had been established by the verdict, they
would not justify or warrant the conclusion that the Probate
Court had no jurisdiction to grant letters of administration
upon said estate after Kendall's removal. On the contrary,
it would appear therefrom that said estate had not been fully
settled and distributed among the parties entitled thereto.
And whether it was absolutely essential that further adminis-
tration should be had upon it, or whether it was for the in-
terest of the heirs or creditors that the administration should
be longer continued, certainly it cannot be said that it was
not within the power and jurisdiction of the court to grant
letters of administration *de bonis non* to complete its full and
final settlement.

An inspection of the special verdict of the jury will also
show that it does not warrant the deductions which the court
has drawn from it and on which it renders its judgment.
The jury find that at the close of W. E. Kendall's adminis-
tration of said estate it owed a small amount to Baldwin &
Williams. But they do not say that this was the only debt
existing at the date of Frost's death which said estate still
owed. The question to which this response was made di-
rectly excludes from consideration of the jury debts which

may have been in suit at the removal of Kendall and subsequently established by judgment as valid claims against said estate. And while the jury find that there had been personal property, as well as lands situated in Fort Bend county, partitioned among the legatees, they do not find that all the property belonging to the estate had been partitioned. Nor was such a finding within the scope of the questions submitted to them by the court. And although they find that the estate was solvent at the time Kendall ceased to administer it, they do not find that there were funds in his hands with which to pay the debt of Baldwin & Williams; or if so, that he could have legally appropriated them to its payment after he had been removed as executor of the estate.

It is also plainly manifest, from an examination of the several issues submitted to the jury, that they were altogether insufficient to elicit such a verdict as to authorize or warrant the judgment which was rendered by the court. The sole ground upon which it is claimed that the court did not have jurisdiction to grant administration *de bonis non* on the estate of Frost, after the removal of Kendall, is, that it had been fully administered. Yet the court refused to submit to the jury this precise issue, although asked by appellants; also whether the debts of said estate were all paid, and whether there were suits pending against it at that time. But it submitted to them the immaterial inquiry whether the estate owed Pettus anything when he was appointed administrator. And from other questions propounded, it evidently seemed to suppose, if the debts existing at the time of Frost's death, which were not in litigation, had been paid, and a part of the property of the estate had been partitioned with the consent of the executor, the Probate Court had no jurisdiction over the estate or power to grant letters of administration on it, notwithstanding the fact that suits were pending both for and against it, and that no final partition of the entire estate had or could be made until the conflicting rights and liabilities in regard to the matters then in litigation had been

settled and adjusted. It is needless to say that this was a mistake. Most of the issues submitted to the jury by the court were altogether immaterial, and in no way tended to elucidate or settle the matters in controversy between the parties or furnish the basis for a judgment. And upon the most vital and important of them the verdict of the jury is clearly in favor of appellants.

The judgment is reversed and the cause remanded.

REVERSED AND REMANDED.